UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

BRIDGEWELL RESOURCES LLC, an Oregon
limited liability company,

        Plaintiff,

    v.

TANAMERA CONSTRUCTION, LLC, a Nevada
limited liability company,

        Defendant.

Case No. 3:20-cv-00518-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge:

**FINDINGS**

Plaintiff Bridgewell Resources LLC ("Bridgewell") brought suit in Washington County

Circuit Court against defendant Tanamera Construction, LLC ("Tanamera") for breach of

contract and promissory estoppel, and Tanamera timely removed the matter to federal court.

Notice of Removal, ECF 1. This court has diversity jurisdiction over this action pursuant to 28

U.S.C. § 1332(a)(1), as the matter in controversy exceeds $75,000 and the parties are citizens of

different states.

Tanamera has filed a motion to dismiss for lack of personal jurisdiction. Def.'s Mot.

Dismiss, ECF 6. Bridgewell has filed written objections to some of Tanamera's evidence. Pl.'s

Evidentiary Objs., ECF 14.  For the reasons set forth below, Bridgewell's evidentiary objections should be sustained, and Tanamera's motion to dismiss should be denied.

## I.    Background

Tanamera, a general contractor with its principal place of business in Nevada, contracted with Voltaire Master, LLC ("Voltaire") to build a luxury apartment development, the Carson Hills Apartment Project ("project" or "Carson Hills project"), in South Carson City, Nevada. Compl. ¶¶ 4-5, ECF 1-1; Corr. & Suppl. Brett Seabert Decl. ¶ 3, ECF 12.  The Carson Hills project consists of 440 apartment units, a clubhouse, a maintenance building, and garages.  Corr. & Suppl. Seabert Decl. ¶ 3, ECF 12.[1]

Bridgewell is a nationwide wholesale distributor of framing lumber and specialty building materials, with its principal place of business in Oregon.  Mark Maulding Decl. ¶ 2, ECF 10.  In November 2017, Tanamera and Bridgewell began discussing a contract to lock in prices for framing materials for the Carson Hills project, including lumber, oriented strand board, siding, and truss joists.  *Id.*, Ex. 1, ECF 10-1.  Tanamera secured bids for framing materials from several suppliers and ultimately chose to purchase materials from Bridgewell.

For several months in 2019, Tanamera ordered, and Bridgewell delivered, framing materials to the Carson Hills project site in Nevada.  *See id.* ¶¶ 13-14, ECF 10; Corr. & Suppl. Brett Seabert Decl. ¶¶ 7-8, ECF 12.  The parties came to an impasse in August 2019, and Bridgewell sued.  As explained in detail below, the parties dispute what documents make up their agreement and the terms of the agreement, which is pertinent to Tanamara's motion to dismiss for lack of personal jurisdiction.

---

[1] Many of the same documents are attached as exhibits to the declaration of Mark Maulding (ECF 10).  For ease of reference, citations are only to the exhibits attached to the corrected and supplemental declaration of Brett Seabert (ECF 12).

## II.      Legal Standard

When faced with a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that the court's exercise of jurisdiction is proper. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). Where the court's determination is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a *prima facie* showing of jurisdictional facts." *Id.* (quoting *Scher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)); *Schwarzenegger*, 374 F.3d at 800 (holding the court must "only inquire into whether the plaintiff's pleadings and affidavits make a *prima facie* showing of personal jurisdiction"). A plaintiff cannot rest on the bare allegations of its complaint, but uncontroverted allegations in the complaint must be taken as true. *Id.* "Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019) (citing *Schwarzenegger*, 374 F.3d at 800).

## III.     Personal Jurisdiction

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Picot*, 780 F.3d at 1211 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)); *see* FED. R. CIV. P. 4(k)(1)(A). Oregon Rule of Civil Procedure ("O.R.C.P.") 4 L confers jurisdiction "in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States." Thus, Oregon extends jurisdiction to the limits of due process under the United States Constitution. *Swank v. Terex Utilities, Inc.*, 274 Or. App. 47, 57 (2015).

For this reason, Bridgewell's extended discussion of O.R.C.P. 4 D(1) and cases from the late 1980s and early 1990s interpreting this rule is misplaced.  *See* Pl.'s Resp. 10-12, ECF 9. O.R.C.P. 4 B through K specify circumstances where Oregon courts have specific jurisdiction over nonresident defendants.  In contrast, O.R.C.P. 4 L extends jurisdiction to "any case not covered in the specific sections, within the limits of due process."  *Swank*, 274 Or. App. at 57 (quoting Comment to Rule 4, Final Rule, Oregon Rules of Civil Procedure, Council on Court Procedures, Dec. 2, 1978, at 12-13).  Because the circumstances specified in O.R.C.P. 4 B through K must be narrower or coextensive with the limits of federal due process, federal courts "proceed directly to the federal due process analysis."  *Witt Co. v. RISO, Inc.*, 948 F. Supp. 2d 1227, 1248 (D. Or. 2013) (citing *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003)); *see also Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 n.1 (9th Cir. 1990) (rejecting proposition that the court could dispense with the due process analysis because the action fell into one of the specially defined categories of Oregon's long-arm statute); *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 454 F. Supp. 3d 1040, 1045-46 (D. Or. 2020), *appeal dismissed* (May 27, 2020) ("Oregon's long-arm statute is coextensive with the federal Due Process clause, so the only question before me is whether this court's exercise of jurisdiction over the Seirus Defendants would offend constitutional due process requirements.).  Therefore, the only question is whether the exercise of personal jurisdiction over Tanamera would offend constitutional due process requirements.  *See Walden v. Fiore*, 571 U.S. 277, 283 (2014).

Constitutional due process requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (citations

omitted).  "In giving content to that formulation, the Court has long focused on the nature and

extent of 'the defendant's relationship to the forum State.'"  *Ford Motor Co. v. Montana Eighth

Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of

California, San Francisco Cty.*, 137 S. Ct. 1773, 1779 (2017)).  That focus led to the recognition

of two kinds of personal jurisdiction: general jurisdiction and specific jurisdiction.  *Id.* (citing

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  However,

"because the personal jurisdiction requirement is a waivable right," personal jurisdiction may

rest entirely upon consent.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985); *Ins.

Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982) ("the

requirement of personal jurisdiction may be intentionally waived").

> In the commercial context, parties, for business or convenience reasons,
> frequently stipulate in advance to submit their controversies for resolution within
> a particular jurisdiction.  Where such forum-selection provisions have been
> obtained through freely negotiated agreements and are not unreasonable and
> unjust, their enforcement does not offend due process.

*Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994) (citations omitted); Carol

Andrews, *Another Look at General Personal Jurisdiction*, 47 WAKE FOREST L. REV. 999, 1072-

73 (2012) ("A consent theory changes the constitutional inquiry.  First, it shifts any due process

analysis from minimum contacts to the validity of the consent.  Under *Bauxites*, consent is a

proper basis for jurisdiction, independent of *International Shoe* minimum contacts analysis.").

Here, Bridgewell asserts four bases for personal jurisdiction: (1) general jurisdiction,

(2) specific jurisdiction, (3) consent to jurisdiction through forum selection clauses in a

commercial credit application that Tanamara executed with Bridgewell on January 8, 2018, and

(4) consent to jurisdiction through a forum selection clause in Bridgewell's web-based terms and

conditions, which is incorporated by reference into a bid, which itself is incorporated by

reference into a purchase order that Bridgewell argues comprises part of the parties' operative contract. Tanamera contests all four bases.

### A.    General Jurisdiction

General jurisdiction extends to "any and all claims" brought against a defendant, but a court may exercise general jurisdiction only when a defendant is "essentially at home" in the forum state. *Ford Motor*, 141 S. Ct. at 1024 (citation omitted). Individuals are subject to general jurisdiction in their place of domicile. *Id.* (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). A corporation is subject to general jurisdiction in its place of incorporation and its principal place of business, but a corporation may be "at home" somewhere else in an exceptional case. *Id.* (citing *Daimler*, 571 U.S. at 139 n.19).

Tanamera is incorporated in Nevada and has its principal place of business in Reno, Nevada. Corr. & Suppl. Seabert Decl. ¶ 2, ECF 12. Tanamera does not maintain any place of business in Oregon and is not licensed to work and does not perform any work in Oregon. *Id.* Tanamera admits that it rarely contracts with Oregon-based suppliers for materials for use in its out-of-state construction activities. *Id.* As such, Tanamera is not "essentially at home" in Oregon and this court lacks general jurisdiction over Tanamera.

Bridgewell relies on O.R.C.P. 4 A(5) to argue Tanamera is subject to general personal jurisdiction in Oregon because representatives of Tanamera "twice agreed to suit" in Oregon. Pl.'s Resp. 6-8, ECF 9. Under O.R.C.P. 4 A(5), Oregon courts have general personal jurisdiction over a defendant that "[h]as expressly consented to the exercise of personal jurisdiction over such defendant." *See Wallace v. Holden*, 297 Or. App. 824, 830, *review denied*, 365 Or. 557 (2019) ("Oregon courts have recognized that ORCP 4 A provides for 'general' personal jurisdiction.") However, this court must apply federal procedural law to ascertain whether it has

personal jurisdiction over Tanamera. *See In re Cty. of Orange*, 784 F.3d 520, 523-24 (9th Cir.

2015). Under federal procedural law, a forum selection clause does not confer general

jurisdiction. Instead, it serves as a limited waiver of the right to object to being sued in the

forum for lack of personal jurisdiction if the dispute falls within the scope of the clause and the

clause is enforceable. *See Burger King*, 471 U.S. at 472 n.14; *Ins. Corp. of Ireland*, 456 U.S. at

704; *Dow Chem. Co. v. Calderon*, 422 F.3d 827, 831 (9th Cir. 2005).

### B.    Specific Jurisdiction

"Specific jurisdiction covers defendants less intimately connected with a State [than

general jurisdiction], but only as to a narrower class of claims." *Ford Motor*, 141 S. Ct. at 1024.

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant

'focuses on the relationship among the defendant, the forum, and the litigation.'" *Axiom Foods,*

*Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting *Walden*, 571 U.S. at

283).

The Ninth Circuit employs a three-prong test for analyzing specific jurisdiction. First,

"the non-resident defendant must purposefully direct his activities or consummate some

transaction with the forum or resident thereof; or perform some act by which he purposefully

avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits

and protections of its laws." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz*

*Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020) (quoting *Schwarzenegger*, 374 F.3d at 802).

"Second, the claim must be one which arises out of or relates to the defendant's forum-related

activities." *Id.* (quoting *Schwarzenegger*, 374 F.3d at 802). This prong does not require a "strict

causal relationship," i.e., "proof that the plaintiff's claim came about because of the defendant's

in-state conduct." *Ford Motor*, 141 S. Ct. at 1026. Third, the exercise of jurisdiction must

comport with fair play and substantial justice, i.e., it must be reasonable. *Global Commodities*, 972 F.3d at 1107.

### 1.    Purposeful Availment

The first prong of the specific-jurisdiction inquiry asks whether the defendant has voluntarily derived some benefit from its interstate activities such that it "will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* (quoting *Burger King*, 471 U.S. at 474-75).

"Purposeful availment" and "purposeful direction" are distinct concepts. *Id.* Purposeful availment generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort. *Id.* (citations omitted). "When both contract and tort claims are at issue, both tests are relevant." *Id.* (citing *Picot*, 780 F.3d at 1212). Here, Bridgewell only asserts claims for breach of contract and promissory estoppel; therefore, the purposeful availment analysis is applicable.

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) (citation omitted). "[A] contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Id.* at 1017. Parties to an interstate contract who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities." *Burger King*, 471 U.S. at 473 (citation omitted). These continuing relationships must create a "substantial connection" between the defendant and the forum state that is not "random, fortuitous or attenuated." *Id.* at 479-80; *compare McGee v. Int'l Life Ins. Co.*, 355 U.S.

220, 223 (1957) ("It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with [the forum] State.") *with Bristol-Myers Squibb Co.*, 137 S. Ct. at 1783 ("The bare fact that [the defendant] contracted with a California distributor is not enough to establish personal jurisdiction in the State.").

In cases involving contractual obligations, the Supreme Court emphasizes "the need for a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King*, 471 U.S. at 479 (citations omitted). The court's review of the contractual relationship must be "practical and pragmatic." *Boschetto*, 539 F.3d at 1016. Courts should consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" in determining whether the defendant purposefully established minimum contacts within the forum. *Burger King*, 471 U.S. at 479. A defendant who created continuing obligations to residents of another state has satisfied the "purposeful availment" requirement. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). Conversely, a continuing relationship is not established by a "one-time contract for the sale of a good that involved the forum state only because that is where the purchaser happened to reside, but otherwise created no substantial connection or ongoing obligations there." *Boschetto*, 539 F.3d at 1019 (citation omitted). The Ninth Circuit has "emphasized that courts must evaluate the parties' entire course of dealing, not solely the particular contract or tortious conduct giving rise to the claim, when assessing whether a defendant has minimum contacts with a forum." *Global Commodities*, 972 F.3d at 1108 (citing *Picot*, 780 F.3d at 1212 and *Sher v. Johnson*, 911 F.2d 1357, 1363-64 (9th Cir. 1990).

Here, the parties dispute whether Tanamera reached out to Bridgewell in Oregon to secure a bid for framing materials or whether Tanamera solicited bids in Nevada and Bridgewell reached into Nevada to negotiate the bid.  *See* Pl.'s Resp. 2, ECF 9; Def.'s Reply 16 n.19, ECF 11.  Tanamera's former vice president of construction, Joe Hurst, declares that in August 2018, Bridgewell's former sales representative, Bryan Davidson, "initiated discussions (telephone and/or email) with me concerning supplying lumber for framing on the Project."  Joe Hurst Decl. ¶ 2, ECF 8.  Bridgewell asserts this is untrue because its salesforce records show the parties were in communication for several months before August 2018.  Pl.'s Resp. 2, ECF 9.  Those records show three communications related to the Carson Hills project in November 2017, March 2018, and July 2018.  Maulding Decl., Ex. 1, at 1-2, ECF 10-1.  The records are silent as to which party initiated those communications.  However, the bid states that it was "prepared at Buyer's [i.e., Tanamara's] request or for Buyer's convenience . . . based on assumptions and information provided to Seller [i.e., Bridgewell] by the Buyer."  Corr. & Suppl. Seabert Decl., Ex. 2, at 7, ECF 12-2.  The conflicts between these declarations regarding which party initiated communications must be resolved in Bridgewell's favor on a motion to dismiss for lack of personal jurisdiction.  *See In re Boon Glob. Ltd.*, 923 F.3d at 650.

Nonetheless, even if Tanamera reached out to Bridgewell in Oregon, it created a contact with Bridgewell only.  *Walden*, 571 U.S. at 1122 (instructing courts to look "to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there").  There is no indication, for example, that Tanamera advertised in Oregon or otherwise solicited bids from other Oregon-based suppliers related to the project.

Moreover, "the fact that a contract envisions one party discharging his obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the

contract." *Picot*, 780 F.3d at 1213.  Tanamera exchanged a series of emails and purchase orders

with Bridgewell from Nevada.  Maulding Decl. ¶¶ 6, 8, 12, ECF 10; *id.*, Ex. 8, at 1-2, ECF 10-1.

The agreement envisioned that Tanamera would order framing materials from Bridgewell per the

superintendent's direction between November 2018 and July 2019, for delivery at the Carson

Hills project site in Nevada.  *See* Corr. & Suppl. Seabert Decl., Ex. 5, at 1-2, ECF 12-5; *id.* ¶¶ 7-

8, ECF 12 (indicating Bridgewell delivered lumber to the project site).  Bridgewell affirms that

on multiple occasions for "a few months in 2019,"

> Tanamera notified Bridgewell, in Oregon, when certain building materials were
> needed during various phases of the Project.  Bridgewell then sent the requisite
> materials and the corresponding invoices from Oregon to Nevada, counting the
> value of the materials against the contract sum.  Tanamera responded by sending
> Bridgewell payment for those materials to Oregon from Nevada.

Maulding Decl. ¶ 13, ECF 10; Corr. & Suppl. Seabert Decl. ¶ 3, ECF12.  The handful of emails

and phone calls that Tanamera placed to Bridgewell in Oregon are insufficient to constitute

purposeful availment.  *See In re Boon Glob. Ltd.*, 923 F.3d 643, 653 (9th Cir. 2019) ("ordinarily

(sic) use of the mails, telephone, or other international communications simply do not qualify as

purposeful activity invoking the benefits and protection of the forum state").  No Tanamera

employee or agent physically entered Oregon in negotiating, executing, or allegedly breaching

the agreement.  Corr. & Suppl. Seabert Decl. ¶ 7; *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136,

1146-47 (9th Cir. 2017) (holding physical entry into the forum state is a relevant contact).

    Further, that Tanamera sent payments to Bridgwell in Oregon is insufficient to create

minimum contacts with Oregon.  Sending payments to a plaintiff in the forum state is "the kind

of 'unilateral activity' that the Ninth Circuit has explained cannot form the basis for personal

jurisdiction."  *Wellpartner, Inc. v. DeLeon Pharmacy, Inc.*, No. 3:15-CV-01577-HZ, 2015 WL

7568591, at *6 (D. Or. Nov. 24, 2015) (citing *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802,

816 (9th Cir. 1988) and *Picot*, 780 F.3d at 1212-1213); *see also, e.g.*, *Infusion Partners v. Otono Networks, Inc.*, No. 3:16-CV-2288-AC, 2017 WL 1959225, at *8 (D. Or. Apr. 12, 2017), *report and recommendation adopted,* No. 3:16-CV-02288-AC, 2017 WL 1960661 (D. Or. May 9, 2017) (same).

Bridgewell argues that it felt harm in Oregon because of Tanamera's conduct.  Pl.'s Resp. 19-20, ECF 9.  However, the "inquiry is limited to examining contacts that 'proximately result from actions by the defendant *himself.*'"  *Picot*, 780 F.3d at 1213 (quoting *Burger King*, 471 U.S. at 475).  Permitting Bridgewell's harm to form the basis for personal jurisdiction would be another way of "allow[ing] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.*  (quoting *Walden*, 134 S. Ct. at 1125).

Bridgewell is correct that Tanamera has contracted with Oregon-based suppliers for materials for use in its out-of-state construction activities.  Pl.'s Resp. 11, ECF 9; *see* Corr. & Suppl. Seabert Decl. ¶ 2, ECF 12 (admitting Tanamera "rarely contracts" with Oregon-based suppliers).  But this bears little weight in the purposeful availment analysis because, although the Supreme Court has acknowledged "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties," "a defendant's relationship with a plaintiff or a third party, standing alone, is an insufficient basis for jurisdiction."  *Walden*, 134 S. Ct. at 1123.

Further still, that Tanamera purportedly signed a contract with a clause designating Oregon as the forum for any litigation, without much more, similarly fails to sway the purposeful availment analysis.  In *Burger King*, the Supreme Court cautioned that agreement to a forum selection clause "standing alone would be insufficient to confer jurisdiction," but reasoned that "when combined with the 20-year interdependent relationship [the defendant] established with

Burger King's Miami headquarters, it reinforced [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."  471 U.S. at 482. Here, this was Tanamera's first or second contract with Bridgewell, and it appears the relationship lasted for less than a year.  Further, Tanamera contends that Bridgewell's terms and conditions, and the forum selection clause by extension, "were not discussed, provided to Tanamera, reviewed, or otherwise agreed upon."  Hurst Decl. ¶ 3, ECF 8; *e.g.*, *Nimbus Data Sys., Inc. v. Modus LLC*, No. 14-CV-04192 NC, 2014 WL 7387200, at *6 (N.D. Cal. Dec. 29, 2014) (noting a lack of evidence that defendant "was even aware of the arbitration and choice-of-law provisions before or at the time it entered into the contract to purchase the products").  Additionally, while Tanamera executed a commercial credit application, Hurst Decl. ¶ 3,  Ex. 2, at 1-2, ECF 10-1, Tanamera affirms this credit application is related to a different project—also in Nevada.  Corr. & Suppl. Seabert Decl. ¶ 9, ECF 12.  As discussed below, this law suit does not fall within the scope of the forum selection clause in that document.

Lastly, Tanamera argues it could not have availed itself of the benefits and protections of the laws of Oregon because there is a Nevada law that requires all contracts relating to construction occurring in Nevada to be subject to the laws of Nevada and subject to litigation within Nevada.  Pl.'s Mot. Dismiss 8, ECF 6 (citing N.R.S. 108.2453(2)(d)).  However, that is an entirely separate inquiry.  Nevada law has no bearing on whether Tanamera has minimum contacts with the State of Oregon.

In sum, Tanamera's contacts with Oregon are not continuous or substantial and instead may be more appropriately described as fortuitous or attenuated.  Even construing the evidence in Bridgewell's favor, Bridgewell has failed to show Tanamera purposefully availed itself of the privilege of conducting business activities in Oregon.

####         2.        **Remaining Prongs**

Because Bridgewell has failed to meet its burden of establishing purposeful availment, the court need not reach the remaining prongs of the test for specific jurisdiction. *E.g.*, *Infusion Partners*, 2017 WL 1959225, at *8. This court lacks specific jurisdiction over Tanamera.

### C.        **Consent to Personal Jurisdiction**

That general and specific jurisdiction are lacking does not end the inquiry. Bridgewell also argues that Tanamera has consented to personal jurisdiction by twice agreeing to be subject to suit in Oregon, through (1) forum selection clauses in a commercial credit application and that application's reference to Bridgewell's web-based terms and conditions, and (2) a forum selection clause in Bridgewell's web-based terms and conditions, which is incorporated by reference into a bid, which itself is incorporated by reference into a purchase order that Bridgewell argues is part of the parties' operative contract. Each are discussed in turn.

####         1.        **Commercial Credit Application**

The commercial credit application that Tanamara signed with Bridgewell on January 8, 2018, includes the following provisions:

> Applicant agrees to abide by the terms and conditions of sale applicable to each purchase made on an account established by Seller in Applicant's name (an "Account"), which terms and conditions shall include the General Terms and Conditions of Order Acknowledgement set forth on Seller's Internet website (www.bridgewellresources.com) at the time of purchase.
> . . .
> The parties hereby agree that if any suit or action is brought in connection with an Account, venue for such suit or action shall be in the appropriate state court in the County of Washington, State of Oregon, U.S.A.

Maulding Decl., Ex. 2, at 1, ECF 10-1. Bridgewell's web-based terms and conditions, i.e., the General Terms and Conditions of Order Acknowledgement, also contain a forum selection clause placing venue in Washington County, Oregon. *Id.*, Ex. 6, at 4, ECF 10-1.

The question, then, is whether this dispute concerns a purchase made, or is brought in connection with a purchase made, on an account established by Bridgewell in Tanamera's name. It does not. Bridgewell alleges Tanamera has stopped making purchases in breach of a separate agreement, not that an account is past due or otherwise at issue pursuant to an extension of credit. Thus, the forum selection clauses in the commercial credit application do not apply.

### 2.    Purchase Orders and Attached Bid

The parties agree they had a contract but dispute what documents and terms form the operative contract. The relevant facts are set forth below, followed by a summary of the parties' arguments. Ultimately, the question is whether the bid, which states it is subject to Bridgewell's web-based terms and conditions, which contain a forum selection clause, is part of the operative contract.

### a.    Relevant Facts

### i.    First Purchase Order

On August 28, 2018, Tanamera signed both pages of a two-page purchase order (hereafter "first purchase order") and emailed it to Bridgewell. Corr. & Suppl. Seabert Decl. ¶ 5, ECF 12; *id.*, Ex. 1, at 1-2, ECF 12-1; Maulding Decl. ¶ 6, ECF 10. The first purchase order contains the description "Lumber, OSB, Siding, & TJI's for the Clubhouse, Maintenance Building, 10 & 20 Unit, and the Garages." Corr. & Suppl. Seabert Decl., Ex. 1, at 1, ECF 12-1. It also contains a table with cost codes for 29 buildings with subtotals for each building and a grand total of $3,783,102.45. *Id.* at 1-2. The first page of the first purchase order is depicted in part as follows:

## Lumber, OSB, Siding, & TJI's

| DATE CREATED: | 08/22/2018 | | |
|---|---|---|---|
| BILL TO: | Tanamera Construction, LLC<br>5560 Longley Lane<br>Reno, NV 89511 | SHIP TO: | Carson Hills Apartments<br>400 W. Clearview Dr.<br>Carson City, NV 89703 |
| CONTRACT COMPANY: | Bridgewell Resources, LLC<br>PO Box 23372<br>Tigard, Oregon 97281<br>Phone: 503-314-9793 | CREATED BY: | Shawna Kopecki (Tanamera Construction, LLC)<br>5560 Longley Lane Suite 200<br>Reno, Nevada 89511 |
| STATUS: | Approved | EXECUTED: | No |
| PAYMENT TERMS: | Submit by the 20th of the month to be<br>paid the 20th of the following month | ASSIGNEE: | No Assignee |
| SHIP VIA: | | DELIVERY DATE: | |
| DEFAULT RETAINAGE: | | | |

DESCRIPTION:
Lumber, OSB, Siding, & TJI's for the Clubhouse, Maintenance Building,10 & 20 Unit, and the Garages

ATTACHMENTS:

| # | COST CODE | DESCRIPTION | TYPE | AMOUNT |
|---|---|---|---|---|
| 1 | 06-1010 - Carpentry - Frame Labor | Clubhouse | General | $ 57,064.16 |
| 2 | 06-1010 - Carpentry -Frame Labor, Lumber | Maintenance Building | General | $ 25,201.19 |
| 3 | 06-1010 - Framing Contractor | Bldg A | General | $ 194,970.36 |
| 4 | 06-1010 - Framing Contractor | Bldg B | General | $ 103,862.69 |
| 5 | 06-1010 - Framing Contractor | Bldg C | General | $ 194,970.36 |

*Id.* at 1.

Three days later, on August 31, 2018, Bridgewell signed both pages of the first purchase

order and emailed it back to Tanamera. *See id.*, Ex. 5, at 1, ECF 12-5 (reflecting Tanamera's

signature dated August 28, 2018, and Bridgewell's signature dated August 31, 2018).[2]

### ii.     Second Purchase Order

On September 5, 2018, Bridgewell emailed Tanamera a copy of the first purchase order

but with several changes (hereafter "second purchase order").  Corr. & Suppl. Seabert Decl. ¶ 6,

ECF 12; Maulding Decl. ¶ 7, ECF 10.  On the first page, Bridgewell listed an attachment: "Bid

prepared for Tanamera Construction, LLC, Carson Hills Apartments, dated 9/5/2018."  Corr. &

Suppl. Seabert Decl.*, Ex 3, at 1, ECF 12-3.  Bridgewell added the language "per the attached

---

[2] During oral argument, Bridgewell confirmed it signed this purchase order on August 31, 2018.

bid" to the end of the description, added a text box with a summary of building materials, and

updated the buildings listed in the table with the number of units in each building:

## Lumber, OSB, Siding, & TJI's

| | |
|---|---|
| DATE CREATED: | 08/22/2018 |

| | | | |
|---|---|---|---|
| BILL TO: | Tanamera Construction, LLC<br>5560 Longley Lane<br>Reno, NV 89511 | SHIP TO: | Carson Hills Apartments<br>400 W. Clearview Dr.<br>Carson City, NV 89703 |
| CONTRACT COMPANY: | Bridgewell Resources, LLC<br>PO Box 23372<br>Tigard, Oregon 97281<br>Phone: 503-314-9793 | CREATED BY: | Shawna Kopecki (**Tanamera Construction, LLC**)<br>5560 Longley Lane Suite 200<br>Reno, Nevada 89511 |
| STATUS: | Approved | EXECUTED: | No |
| PAYMENT TERMS: | Submit by the 20th of the month to be<br>paid the 20th of the following month | ASSIGNEE: | No Assignee |
| SHIP VIA: | | DELIVERY DATE: | |
| DEFAULT RETAINAGE: | | | |
| DESCRIPTION: | delivery of the building materials described below for the following building types: 20 unit (x15), 10 unit (x7),<br>Clubhouse and Clerestory (x1), Maintenance Building (x1), Garage (x5) | | |

Lumber, OSB, Siding, & TJI's for the Clubhouse, Maintenance Building, 10 & 20 Unit, and the Garages per the attached bid

ATTACHMENTS:   Bid prepared for Tanamera Construction, LLC, Carson Hills Apartments, dated 9/5/2018

| # | COST CODE | DESCRIPTION | TYPE | AMOUNT |
|---|---|---|---|---|
| 1 | 06-1010 - Carpentry - Frame Labor | Clubhouse and Clerestory | General | $ 57,064.16 |
| 2 | 06-1010 - Carpentry -Frame Labor, Lumber | Maintenance Building | General | $ 25,201.19 |
| 3 | 06-1010 - Framing Contractor | Bldg A (20 unit) | General | $ 194,970.36 |
| 4 | 06-1010 - Framing Contractor | Bldg B (10 unit) | General | $ 103,862.69 |
| 5 | 06-1010 - Framing Contractor | Bldg C (20 unit) | General | $ 194,970.36 |

*Id.* (highlighting added).

Bridgewell also added the following text below the last row of the table:

Deliveries will be between 10/1/2018 and 4/30/2019.  Seller and Buyer agree that
the detailed delivery schedule and any subsequent changes will be agreed upon in
writing between Seller and Buyer.  If the framing portion of the construction does
not start on or about the delivery start date or end on or about the delivery end
date, Buyer may be subject to additional storage and interest charges related to
this Purchase Order.

*Id.* at 2 (hereafter "delivery window and accompanying text").[3]

---

[3] Bridgewell confirmed during oral argument that it digitally altered the first purchase order to
make these changes.

Additionally, Bridgewell attached a seven-page "bid" of fixed price estimates for materials. *Id.*, Ex. 2, ECF 12-2 (bid). Importantly, this bid is the only document that describes the types and quantities of specific materials (i.e., lumber, OSB, siding, and TJIs). *See id.* The bottom of each page of the bid has a signature block, a delivery window, and a provision that reads, "This bid is subject to Terms & Conditions of Order Acknowledgement found on www.bridgewellresources.com." *Id.* at 1-7. Bridgewell's website contains a document entitled "Sales Order Acknowledgment General Terms and Conditions" that has the following two provisions, among many others:

> 17.    DISPUTE RESOLUTION. Except as set forth herein, any claim of any kind that arises out of or relates to the Order Acknowledgment, or to the interpretation or breach thereof, shall be brought solely in the state court sitting within Washington County, Oregon.
>
> 18.    GENERAL. The rights and obligations of the parties under the Order Acknowledgment shall be governed by the laws of the State of Oregon, U.S.A. in effect as of the date of the Order Acknowledgment, including without limitation the provisions of the Oregon Uniform Commercial Code, but without regard to conflicts of law principles.

Maulding Decl., Ex. 6, at 4-5, ECF 10-1.

Upon receiving these documents, a Tanamera representative crossed out the delivery window dates and wrote "Delivery per superintendent's order" on the second page of the purchase order:

Delivery per superintendents order

Deliveries will be between ~~10/1/2018~~ and ~~4/30/2019~~. Seller and Buyer agree that the detailed delivery schedule and any subsequent changes will be agreed upon in writing between Seller and Buyer. If the framing portion of the construction does not start on or about the delivery start date or end on or about the delivery end date, Buyer may be subject to additional storage and interest charges related to this Purchase Order.

*Id.*, Ex 3, at 2, ECF 12-3. Also, on the first page of the bid, the representative wrote "Delivery per superintendent's order" and initialed it.



*See id.*, Ex. 2, at 1, ECF 12-2. And the representative crossed out and initialed next to the start and end delivery dates on each page of the bid.

*Id.* at 2-7. The representative did not cross out the provision incorporating Bridgewell's web-based terms and conditions or sign any of the seven signature blocks. *See id.* at 1-7.

Tanamera signed the second purchase order on September 11, 2018, and sent it and the bid back to Bridgewell. *See id.*, Ex 3, at 1-2, ECF 12-3 (showing Tanamera's signature dated September 11, 2018, and Bridgewell's signature dated September 5, 2018); *id.*, Ex. 4, at 1, ECF 12-4 (email dated September 11, 2018).

### iii.    Third Purchase Order

On October 19, 2018, Bridgewell emailed Tanamera that it needed "your initials on 2 pages of your PO." *Id.*, Ex. 6, at 2, ECF 12-6. At this time, Tanamera had not yet purchased any materials from Bridgewell. *Id.* ¶ 7, ECF 12. Bridgewell sales representative Bryan Davidson asked Tanamera to

[P]lease initial the middle of each page and send back to me as soon as you're able. You're initialing 2 things:

      1. A brief description of the building types and number of buildings

      2. *This is in response to the dates lined out on the PO we got back.* We added language making it clear that all materials released to the job site will be directly released and coordinated with the site superintendent, (per write-in on that same PO), *and at the same time added back a longer date range because we require a timeframe of some kind on all our Purchase Orders.* I think this covers both of us, but let me know.

*Id.*, Ex. 6, at 2, ECF 12-6 (Davidson's October 19, 2018 email) (emphasis added).

To this email, Bridgewell attached a modified version of the *first purchase order*—not

the second purchase order (hereafter third purchase order):

## Lumber, OSB, Siding, & TJI's

| | | | |
|---|---|---|---|
| DATE CREATED: | 08/22/ 2018 | | |
| BILL TO: | Tanamera Construction, LLC<br>5560 Longley Lane<br>Reno, NV 89511 | SHIP TO: | Carson Hills Apartments<br>400 W. Clearview Dr.<br>Carson City, NV 89703 |
| CONTRACT COMPANY: | Bridgewell Resources, LLC<br>PO Box 23372<br>Tigard, Oregon 97281<br>Phone: 503-314-9793 | CREATED BY: | Shawna Kopecki (Tanamera Construction, LLC)<br>5560 Longley Lane Suite 200<br>Reno, Nevada 89511 |
| STATUS: | Approved | EXECUTED: | No |
| PAYMENT TERMS: | Submit by the 20th of the month to be paid the 20th of the following month | ASSIGNEE: | No Assignee |
| SHIP VIA: | | DELIVERY DATE: | |

Seller / Buyer

DEFAULT RETAINAGE: → delivery of the building materials described below for the following building types: 20 unit (x15), 10 unit (x7), Clubhouse and Clerestory (x1), Maintenance Building (x1), Garage (x5)

DESCRIPTION:
Lumber, OSB, Siding, & TJI's for the Clubhouse, Maintenance Building, 10 & 20 Unit, and the Garages

ATTACHMENTS:

| # | COST CODE | DESCRIPTION | TYPE | AMOUNT |
|---|---|---|---|---|
| 1 | 06-1010 - Carpentry - Frame Labor | Clubhouse | General | $ 57,064.16 |
| 2 | 06-1010 - Carpentry -Frame Labor, Lumber | Maintenance Building | General | $ 25,201.19 |
| 3 | 06-1010 - Framing Contractor | Bldg A | General | $ 194,970.36 |
| 4 | 06-1010 - Framing Contractor | Bldg B | General | $ 103,862.69 |
| 5 | 06-1010 - Framing Contractor | Bldg C | General | $ 194,970.36 |

*See id.*, Ex. 5, at 1-2, ECF 12-5. Like the first purchase order, the third purchase order does not

contain the language "per the attached bid" at the end of the description, does not list or include

the bid as an attachment, and omits the number of units in specific apartment buildings from the

table.  *See id.*, Ex. 5, ECF 12-5.  However, like the second purchase order, a text box summary of

the building materials described in the table was added.  *See id.*

The third purchase order also includes a different delivery window and text from that

found on page two of the second purchase order:

> Deliveries will be between *11/1/2018* and *7/31/2019*.  Seller and Buyer agree that
> the detailed delivery schedule and any subsequent changes *will be per the Buyer's*
> *Superintendent's direction and* will be agreed upon in writing between Seller and
> Buyer.  If the framing portion of the construction does not start on or about the
> delivery start date or end on or about the delivery end date, Buyer may be subject
> to additional storage and interest charges related to this Purchase Order.

*Id.* at 2 (differences from second purchase order in italics).

On October 22, 2018, Tanamera responded by emailing "initialed copies."  Corr. &

Suppl. Seabert Decl., Ex. 6, at 1, ECF 12-6; *id.*, Ex. 5, at 1-2.  Tanamera likewise did not attach

the bid.

The third purchase order contains both parties' undated initials under the delivery

window and accompanying text.  *See* Corr. & Suppl. Seabert Decl., Ex. 5, at 1, 2, ECF 12-5.



However, the third purchase order does not have new signatures dated in October 2018; rather, it

has the same signatures as the first purchase order.  *Compare id.*, Ex. 1, at 1-2, ECF 12-1

(showing Tanamera's signature dated August 28, 2018) *with id.*, Ex. 5, at 1-2, ECF 12-5

(showing Tanamera's signature dated August 28, 2018, and Bridgewell's signature dated August 31, 2018).  The parties agree the third purchase order came the last in time.[4]

      **b.**      **Analysis**

Bridgewell contends that the operative contract between the parties is comprised of the second purchase order, the bid attached to the second purchase order, and Bridgewell's web-based terms and conditions incorporated by reference into the bid, including the forum selection clause.  Pl.'s Resp. 4, ECF 9.  Bridgewell argues that the later "communications" in October 2018 merely concern the timing of delivery.  *Id.* at 5.  By contrast, Tanamera contends that the third purchase order alone constitutes the operative contract, and argues that because the bid was not attached to or incorporated by reference into that document, Bridgewell's terms and conditions, and the forum selection by extension, is not part of the operative contract.  Def.'s Mot. Dismiss 3-4, ECF 6; Def.'s Reply 7-10, ECF 11.  Tanamera also argues that the bid is not part of the operative contract because (1) Tanamera did not sign the bid, (2) the second purchase order did not incorporate the bid by reference because it was not express, clear, or conspicuous, and (3) the bid did not incorporate by reference Bridgewell's web-based terms and conditions because it also was not express, clear, or conspicuous.  Finally, Tanamera argues that even if the terms and conditions are part of the operative contract, the forum selection clause is void under a Nevada statute (N.R.S. 108.2453(2)(d)) prohibiting such a clause in construction contracts.  *See* Def.'s Reply, ECF 11.

---

[4] The parties clarified during oral argument that, for the purpose of this motion, they understand that the purchase order executed on October 22, 2018 (the third purchase order) came last in time, even though it has August 2018 signatures on it.

### i.        Evidentiary Objections

In support of its motion to dismiss, Tanamera offers a declaration by Kreg Rowe, its managing partner, describing a telephone call he had with former Bridgwell sales representative, Davidson, on November 5, 2019.[5]  Kreg Rowe Decl., ECF 13.  Rowe attests that, during their conversation, Davidson "confirmed, among other things, that the Purchase Order signed on or about October 19, 2019 [i.e., the third purchase order] was the operative purchase order" and "further confirmed that Tanamera was not obligated to purchase all lumber listed under" the third purchase order.  *Id.* ¶ 2.  Tanamera also offers a copy of an email exchange that Rowe had with Davidson later that same day, documenting the telephone conversation.  *Id.*, Ex. 9, ECF 13-1.

Bridgewell objects that this evidence constitutes hearsay.  *See* Pl.'s Evidentiary Objections, ECF 14.  Therefore, in response, Tanamara has offered a declaration by Davidson in which he similarly attests that the third purchase order was the "final agreed upon purchase order."  Bryan Davidson Decl. ¶ 2, ECF 16.  Bridgewell has not objected to Davidson's declaration.  *See* Def.'s Sur-Sur-Reply 6, ECF 15.

Bridgewell is correct that Rowe's declaration and email contain out-of-court statements offered to prove the truth of the matter asserted, i.e., that the third purchase order formed the operative contract between the parties.  *See* Fed. R. Evid. 801(c).  Nevertheless, Davidson's declaration, to which Bridgewell has not objected, contains essentially the same evidence, i.e., Davidson's testimony that the third purchase order was "the final agreed upon purchase order."

---

[5] Davidson left Bridgewell in June 2019.  Davidson Decl. ¶ 1, ECF 16.

Davidson Decl. ¶ 2, ECF 16.  Thus, while Bridgewell's hearsay objection to Rowe's testimony is valid, it makes no difference in the analysis because the evidence is otherwise admissible.[6]

### ii.    Contract Formation and Modification

At oral argument, the parties agreed that there is no material difference between Oregon and Nevada on issues of contract formation.  As such, Oregon law regarding contract formation applies.  *See Angelini v. Delaney*, 156 Or. App. 293, 300 (1998) (instructing courts to apply Oregon law when there is a "false conflict" between state laws).

Oregon subscribes to the objective theory of contracts.  *Ken Hood Const. Co. v. Pac. Coast Const., Inc.*, 201 Or. App. 568, 578 (2005), *opinion adhered to as modified on reconsideration,* 203 Or. App. 768 (2006).  Contract construction is a question of law for the court.  *Hoffman Const. Co. of Alaska v. Fred S. James & Co. of Or.*, 313 Or. 464, 469 (1992).  The goal of contract construction is to ascertain the parties' intent.  *Totten v. N.Y. Life Ins. Co.*, 298 Or. 765, 770 (1985).

Oregon courts follow a three-step inquiry to interpret the provisions of a contract.  *Yogman v. Parrott*, 325 Or. 358, 361 (1997).  The first step is to examine the text of the disputed provision, in the context of the document as a whole.  *Id.*  "If the provision is clear, the inquiry ends."  *Id.*; *see also Hoffman Constr.*, 313 Or. at 470 (indicating a term is ambiguous only if two or more plausible interpretations of that term withstand scrutiny, i.e., continue to be reasonable, after the interpretations are examined considering the particular context in which that term is used in the contract and the broader context of the contract as a whole).  If the provision is

---

[6] Bridgewell also objects that the evidence is not relevant to personal jurisdiction, the subject of the motion currently before the court.  Pl.'s Evidentiary Objections, 3-4, ECF 14.  However, extrinsic evidence, sucha as Davidson's testimony, is relevant as parol evidence of contract formation and whether the parties agreed to select Oregon as a forum.

ambiguous, the court proceeds to the second step: examining extrinsic evidence of the parties'

intent. *Id.* at 363.  The court is to pursue the parties' intent if possible.  *Yogman*, 325 Or. at 364

(citing O.R.S. 42.240).  If, after considering the relevant extrinsic evidence, the court has not

resolved the ambiguity, the court proceeds to the third step of the analysis in which it "relies on

appropriate maxims of construction." *Id.*

    Article II of the Uniform Commercial Code ("U.C.C.") applies in this case because the

contract is for the sale of goods between merchants.[7]  U.C.C. § 2-102 (O.R.S 72.1020).  Under

the U.C.C., "[a] definite and seasonable expression of acceptance or a written confirmation

which is sent within a reasonable time operates as an acceptance even though it states terms

additional to or different from those offered or agreed upon, unless acceptance is expressly made

conditional on assent to the additional or different terms."  U.C.C. § 2-207(1) (O.R.S.

72.2070(1)).

> The additional terms are to be construed as proposals for addition to the contract.
> Between merchants such terms become part of the contract unless:
>     (a) the offer expressly limits acceptance to the terms of the offer;
>     (b) they materially alter it; or
>     (c) notification of objection to them has already been given or is given within a
>     reasonable time after notice of them is received.

U.C.C. § 2-207(2) (O.R.S. 72.2070(2)).

    While the record presents several contract formation issues, only a few need to be

resolved to determine which purchase order is the operative contract.[8]  Specifically, this court

---

[7] Both Oregon and Nevada have adopted Article II of the U.C.C.  *See* O.R.S. 72.2010–72.2100;
N.R.S. 104.2201–104.2210.

[8] Although the parties agreed during oral argument that the U.C.C. governs issues of contract
formation, they did not analyze these issues under the U.C.C. in their briefing.  And although
they agreed these circumstances present a sort of "battle of the forms," they do not invoke
U.C.C. § 2-207 (O.R.S. 72.2070), the provision governing such a dispute.  Nor did the parties

must determine (1) whether the second purchase order was a contract, and (2) if it was, whether

the third purchase order supersedes the second purchase order in its entirety, as Tanamera argues,

or whether it only modifies the delivery terms, as Bridgewell argues.

The purchase order that Tanamera sent to Bridgewell on August 28, 2018, was an offer.

Bridgewell accepted this offer three days later, as the document contains Bridgewell's signature

dated August 31, 2018.  Corr. & Suppl. Seabert Decl., Ex. 5, at 1, ECF 12-5.  Regardless, neither

party asserts the first purchase order is part of the operative contract.

The second purchase order that Bridgewell sent to Tanamera on September 5, 2018, was

also an offer.  It was not an acceptance of a prior purchase order because Bridgewell had already

accepted the first purchase order.  The second purchase order contains the "per attached bid"

language and lists the bid as an attachment.  The document that Tanamera's signed and returned

on September 11, 2018, was an acceptance under U.C.C. § 2-207(1) (O.R.S. 72.2070(1)) because

it was a written confirmation sent within a reasonable time.[9]  Even though it states terms

additional to or different from those offered or agreed upon, it did not make acceptance

conditional on assent to the additional or different terms.  *See* U.C.C. § 2-207(1) (O.R.S.

---

invoke or discuss the integration or merger doctrines or the parol evidence rule, which are
usually relevant when, as here, there are multiple, successive signed writings and arguments that
communications outside those writings should be considered in determining the parties' intent.
As such, this discussion is limited to the parties' arguments and a few issues necessary to resolve
the present motion to dismiss.

[9]  U.C.C. § 2-207(1) (O.R.S. 72.2070)(1)) provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation
> which is sent within a reasonable time operates as an acceptance even though it
> states terms additional to or different from those offered or agreed upon, unless
> acceptance is expressly made conditional on assent to the additional or different
> terms.

72.2070(1)).  Tanamera crossed out the delivery window and added "delivery per superintendent's order" but otherwise left the second purchase order intact.

Tanamera argues that the second purchase order is not a contract because one month later, Bridgewell objected to Tanamera's alteration of the delivery terms.  *See* Corr. & Suppl. Decl., Ex. 5, at 2, ECF 12-5 (modifying delivery window in third purchase order); *id.*, Ex. 6, at 2, ECF 12-6 (Davidson's October 19, 2018 email) ("we require a timeframe of some kind on all our Purchase Orders").  Tanamara relies on U.C.C. § 2-204(3) (O.R.S. 72.2040(3)), which provides that, "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."  However, here, the parties clearly intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy, even without the delivery terms.  To the extent Bridgewell objected to the delivery terms, the question would be whether those terms became part of the contract under U.C.C. § 2-207(2)(b) and U.C.C. § 2-207(2)(c).[10]  That question need not be answered now.  Delivery terms aside, there was a manifestation of mutual assent.  *See* U.C.C. § 2-207(1) (O.R.S. § 72-2070(1)).  The second purchase order was a binding contract.

Next, Tanamera argues that to the extent the third purchase order omits terms from the second purchase order (i.e., the bid or incorporation by reference of the bid), those omissions are

---

[10] U.C.C. § 2-207(2) (O.R.S. 72.2207(2)) provides:

> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>     (a) The offer expressly limits acceptance to the terms of the offer;
>     (b) They materially alter it; or
>     (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

a modification under U.C.C. § 2-209. Under the U.C.C., a modification is "the changing of the terms of the agreement which changes may diminish or increase the duty of either party." 2A ANDERSON U.C.C. § 2-209:50 (3d ed.) (December 2020 update). An agreement modifying a sales contract needs no consideration to be binding. U.C.C. § 2-209(1) (O.R.S. 72.2090(1)). Generally, "parol evidence may be used to show an agreement to modify." *Clark Cty. Sports Enterprises, Inc. v. City of Las Vegas*, 96 Nev. 167, 172 (1980). At the hearing, Tanamera argued the court should consider parol evidence to find the parties executed a modification. However, when that evidence is considered, it shows the parties only intended to modify the delivery terms.

Indeed, Davidson's October 19, 2018 email and the lack of new signatures on the third purchase order show the parties only intended to modify the delivery window. Davidson wrote that he was sending the October 19, 2018 email "in response to the dates lined out on the PO we got back," i.e., the second purchase order. Corr. & Suppl. Seabert Decl., Ex. 6, at 2, ECF 12-6. He explained that the purpose of the request for initials was to make clear that the release of materials would be coordinated with the superintendent and "added back a longer date range because we require a timeframe of some kind." *Id.* Davidson's email does not refer to any other changes that Bridgewell or Tanamera made in the second purchase order. The parties did not execute a new purchase order like they did in September—instead, only the parties' undated initials appear next to the new delivery window and accompanying text. *See id.*, Ex. 5, at 1-2, ECF 12-5. No initials appear next to the delivery text box, which matches the delivery text box on the second purchase order. *See id.* at 1. But no initials appear next to where other terms were added in the September purchase orders, including the language "per the attached bid" and listing the bid as an attachment, which would indicate an intent to drop those terms. *See id.*

True, Davidson digitally altered the first purchase order and sent it to Tanamera to be initialed. But considered together, the evidence does not evince and intent to roll back the otherwise agreed upon terms of the second purchase order.  Thus, the third purchase order is a modification of the the delivery window and accompanying text only.

Tanamera also argues the bid is not part of second purchase order because it did not sign the bid. Def.'s Reply 8, ECF 11.  Tanamera is correct that initials may be insufficient when an agreement contemplates a full signature in the space provided at the end of an agreement.  Def.'s Reply 9, ECF 11 (citing *26 Beverly Glen, LLC v. Wykoff Newberg Corp.*, 334 F. App'x 62, 64 (9th Cir. May 26, 2009), and RESTATEMENT (SECOND) OF CONTRACTS § 134 cmt. b, illus. 1). But Tanamera signed the purchase order and did not cross out the purchase order's "per the attached bid" language or statement listing the bid as an attachment.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 134 cmt. b, illus. 1 (indicating "other evidence of intention" may overcome an unsigned signature block); *id.* § 132 cmt. c ("It is sufficient that the signed writing refers to the unsigned writing explicitly or by implication, or that the party to be charged physically attaches one document to the other or encloses them in the same envelope.").  Nor did Tanamera cross out any of the seven references to Bridgewell's web-based terms and conditions in the bid.

Finally, although the parties do not argue this, there is no contract without the bid because the bid is the only document that contains the quantity and kind of goods with any specificity.  Under the U.C.C., quantity is the only term that must appear in a contract for the sale of goods.  *See* U.C.C. § 2-201(1) (O.R.S. 72.2010(1)).  Tanamera contends this is a requirements contract.  But even a requirements contract based on the buyer's good-faith needs must identify what is required.  *See* U.C.C. § 2-306(2) (O.R.S. 72.3060(2)) ("A lawful agreement by either the

seller or the buyer for exclusive dealing in the *kind of goods* concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.") (emphasis added).  The purchase orders all state grand totals of $3.7 million and subtotals for each of 29 apartment units, but only the bid identifies the subtotal per specific type of lumber, oriented strand board, siding, and truss joists, etc.  *See* Corr. & Suppl. Seabert Decl., Ex. 2, ECF 12-2.  Tanamera agrees the parties had a contract and that the parties mutually performed on the contract for some time.  *See* Maulding Decl. ¶¶ 13-14, ECF 10; Corr. & Suppl. Brett Seabert Decl. ¶¶ 7-8, ECF 12.  For purposes of this motion, it follows that the bid is part of the contract.[11]

### iii.    Incorporation by Reference

Tanamera next challenges the second purchase order's incorporation by reference of the bid and the bid's incorporation by reference of Bridgewell's web-based terms and conditions. Tanamera argues the language "per attached bid" and listing the bid as an attachment is insufficient to incorporate the bid by reference into the operative contract.

Under Oregon law,[12] where a written instrument refers "in specific terms to another writing, the other writing is a part of the contract."  *Hous. Auth. of Jackson Cty. v. Gates*, 246 Or. App. 521, 525 (2011) (quoting *NW Pac. Indem. v. Junction City Water Dist.,* 295 Or. 553, 558

---

[11] The court takes no position here on what appears to be the ultimate issue in this case: whether the operative contract was a requirements contract.

[12] "The proponent of the law of another forum has the obligation to identify material differences between the applicable law of Oregon and of the other forum."  *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 301 (2007).  "The threshold question in a choice-of-law problem is whether the laws of the different states actually conflict."  Tanamera has not identified any material differences between Oregon and Nevada law on the following issues.  Thus, Oregon law applies.  *See Angelini*, 156 Or. App. at 300 (instructing courts to apply Oregon law when there is a "false conflict" between state laws).

(1983), *reh'g denied and opinion modified*, 296 Or. 365 (1984)).  It does not matter whether the writing to be incorporated is provided to the offeree, so long as the writing is available.  *See NW Pacific*, 295 Or. at 558 (finding writing was incorporated by reference when it was "available upon request").  Failure to read the incorporated writing is not a defense to its enforcement.  *Id.* at 557 n.4.

Here, although Tanamera is correct that more direct language is often used to effectuate incorporation by reference, where Bridgewell used the language "per the attached bid"in the second purchase order, listed the bid as an attachment, and sent the bid as an email attachment along with the purchase order, it was sufficient to incorporate the bid by reference into the second purchase order.  *E.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 132 cmt. a (1981).

Further, the bid's incorporation by reference of Bridgewell's web-based terms and conditions also suffices.  The bottom of each page of the bid contains a provision that reads, "This bid is subject to Terms & Conditions of Order Acknowledgement found on www.bridgewellresources.com."  Corr. & Suppl. Seabert Decl., Ex 2, at 1-7, ECF 12-2.  These words are in 12-point font and visible just below the signature line on all seven pages of the bid.

When one navigated to www.bridgewellresources.com in 2018, it led to Bridgewell's homepage.  Maulding Decl. ¶ 11, ECF 10-1.  At the bottom of the homepage was a link that read "TERMS & CONDITIONS."  *Id.*, Ex. 7, at 1.  Clicking on that link displayed the following two hyperlinks:  (1) "Sales Order Acknowledgment General Terms and Conditions" and (2) "Purchase Order General Terms and Conditions."  *Id.* at 2.  Selecting the first link opened a document titled "Order Acknowledgment General Terms and Conditions."  *Id.*, Ex. 6, at 1.  This document contains the forum selection clause.  *Id.* at 4-5.

Tanamera argues that the incorporation by reference is not express, clear, and conspicuous enough to be valid, and that the process to locate the information on Bridgewell's website was too attenuated and indirect.  During oral argument, Tanamera invoked *Technical Securities Integration, Inc. v. Philadelphia Indemnity Insurance Co.*, No. 3:14-CV-01895-SB, 2015 WL 4603893, (D. Or. July 30, 2015), *aff'd,* 710 F. App'x 753 (9th Cir. 2018), in support of its position.  However, *Technical Securities* did not deal with incorporation by reference.  Rather, the ultimate issue was whether to compel arbitration.  A threshold question was whether to apply Washington or Oregon law to make that determination.  The defendant argued the parties had agreed to apply Washington law through an arbitration clause pursuant to O.R.S. 15.350.  Under O.R.S. 15.350(2), "The choice of law must be express or clearly demonstrated from the terms of the contract.  In a standard-form contract drafted primarily by only one of the parties, any choice of law must be express and conspicuous."  The arbitration clause provided that "[u]nless both parties agree otherwise, arbitration will take place in the county or parish in which the address shown in the Declarations is located [i.e., Snohomish County, Washington].  Local rules of law as to procedure and evidence will apply."  *Id.* at *5.  The court found this was not a traditional choice-of-law clause, which "names a particular state and provides that the substantive laws of that jurisdiction will be used . . . , regardless of any conflicts between the laws of the named state and the state in which the case is litigated."  *Id.* (quoting *Johnston Cnty. v. R.N. Rouse & Co., Inc.*, 331 N.C. 88, 92 (1992)).  The court held O.R.S. 15.350 was not satisfied because the contract did not "include an express, clear, and conspicuous Washington choice-of-law clause."  *Id.* at *5 n.3.

Thus, *Technical Securities* applied O.R.S. 15.350, which pertains to choice-of-law clauses, not forum selection clauses.  Although Bridgewell's web-based terms and conditions

contains a choice-of-law clause,[13] Tanamera only identifies a single material difference between Oregon and Nevada law, which is addressed further below. *See*, *infra*, Sect. III.C.2.b.iv (discussing N.R.S. 108.2453). Moreover, here, the operative contract is not "a standard form contract drafted primarily by only one of the parties." *See* O.R.S. 15.350(2). Both parties negotiated and drafted the contract. But even if the standard under O.R.S. 15.350 applied here, the forum selection clause and the process of locating it is sufficiently express, clear, and conspicuous. The clause's "subject to" language is the sort of direct language typically used to effectuate an incorporation by reference. *E.g.*, *Idearc Media, LLC v. Palmisano & Assocs., P.C.*, 929 F. Supp. 2d 939, 944 (D. Ariz. 2013). Further, it only took two clicks to locate the operative document, and the terms and conditions webpage only listed two options, one of which contained the terms "Order Acknowledgement" and "Terms and Conditions" in the title. Although the titles differ slightly, the bid, the link, and the document containing the forum selection clause consistently refer to "order acknowledgment" and "terms and conditions." This language is sufficiently clear, express, and conspicuous to incorporate the terms and conditions by reference.

In *In re Holl*, 925 F.3d 1073, 1083-84 (9th Cir. 2019), the Ninth Circuit denied a writ of mandamus and let stand a district court's order finding that an arbitration clause was enforceable in an online adhesion contract that incorporated by reference online terms and conditions even though locating them required "several steps and a fair amount of web-browsing intuition." Here, it took fewer steps and less intuition to locate Bridgewell's web-based terms and

---

[13] This clause resembles a traditional choice of law clause, which satisfies the standard articulated in *Technical Securities*. *See* Maulding Decl., Ex. 6, at 4-5, ECF 10-1 ("The rights and obligations of the parties under the Order Acknowledgment shall be governed by the laws of the State of Oregon, U.S.A. in effect as of the date of the Order Acknowledgment, including without limitation the provisions of the Oregon Uniform Commercial Code, but without regard to conflicts of law principles.").

conditions. Moreover, the scrutiny employed by courts in favor of consumers in adhesion

contracts is not present here, where the contract is between sophisticated merchants. The forum

selection clause in Bridgewell's web-based terms and conditions is part of the operative contract.

#### iv.    Nevada Statute

Tanamera further argues the forum selection clause is void under N.R.S. 108.2453(2)(d).

Under both Oregon's and Nevada's rules of statutory interpretation, the parties' agreement falls

outside the scope of this statute.

#### 1.    Rules of Statutory Interpretation

Oregon law dictates that the first step of statutory interpretation is an examination of the

text and context of the statute in order "to discern the intent of the legislature." *Portland Gen.*

*Elec. Co. v. Bureau of Labor & Indus.* (*PGE*), 317 Or. 606, 610 (1993), *superseded by statute*,

O.R.S. 174.020; *see State v. Gaines*, 346 Or. 160, 171 (2009) (explaining that O.R.S. 174.020

did not alter the holding in *PGE* regarding the first step of statutory interpretation). "[A]fter

examining text and context," the court will "consult" the legislative history, "even if the court

does not perceive an ambiguity in the statute's text, where that legislative history appears useful

to the court's analysis." *Gaines*, 346 Or. at 172. The "evaluative weight" given to the legislative

history is for the court to determine. *Id*. At the "third[] and final step[] of the interpretive

methodology," if "the legislature's intent remains unclear after examining text, context, and

legislative history, the court may resort to general maxims of statutory construction to aid in

resolving the remaining uncertainty." *Id*.

Under Nevada law, as in Oregon, legislative intent is the controlling factor, and the

starting point for determining legislative intent is the statute's plain meaning. *State v. Lucero*,

127 Nev. 92, 95-96 (2011). But unlike Oregon law, when a statute is clear on its face, courts

cannot go beyond the statute in determining legislative intent. *Id.* It is only when the statutory language lends itself to two or more reasonable interpretations and the statute is ambiguous that courts may then look beyond the statute in determining legislative intent. *Id.* To interpret an ambiguous statute, courts look to the legislative history and construe the statute in a manner that is consistent with reason and public policy. *Id.* (citations omitted).

### 2.    N.R.S. 108.2453(2)(d)

Nevada Revised Statute chapter 108 sets forth Nevada's rules governing statutory liens. Sections 108.221 to 108.246 concern mechanic's and materialmen's liens. Except as otherwise provided in these sections, a party's rights, obligations, and liabilities may not be waived or modified. N.R.S. 108.2453(1). "The object of the lien statutes is to secure payment to those who perform labor or furnish material to improve the property of the owner." *Lehrer McGovern Bovis, Inc. v. Bullock Insulation, Inc.*, 124 Nev. 1102, 1115 (2008) (citation omitted). Further, the Nevada Supreme Court has "held on numerous occasions that the mechanic's lien statutes are remedial in character and should be liberally construed." *Id.*; *see also Simmons Self-Storage v. Rib Roof, Inc.*, 130 Nev. 540, 546 (2014), *as modified on denial of reh'g* (Nov. 24, 2014) ("A mechanic's lien is a statutory creature designed to provide contractors secured payment for their work and materials because they are generally in a vulnerable position.").

Tanamera argues that N.R.S. 108.2453(2)(d) applies to the agreement. It provides:

A condition, stipulation or provision in a contract or other agreement *for the improvement of property* or *for the construction, alteration or repair of a work of improvement* in this State that attempts to do any of the following is contrary to public policy and is void and unenforceable:

. . . .

(d) Require any litigation, arbitration or other process for dispute resolution on disputes arising out of the contract or other agreement to occur in a state other than this State;

N.R.S. 108.2453(2)(d) (emphasis added).  "Contract" is defined as "a written or oral agreement, including all attachments and amendments thereto, for the provision of work, materials or equipment for a work of improvement."  N.R.S. 108.2212.  The question is whether the contract between Bridgewell and Tanamera is an agreement for the improvement of property or an agreement for the construction, alteration, or repair of a work of improvement as further defined by the statutory scheme.  *See* N.R.S. 108.2453(2).

### a.    Improvement of Property

'Improvement' means the development, enhancement or addition to property, by the provision of work, materials or equipment. The term includes, without limitation:

> 1. A building, railway, tramway, toll road, canal, water ditch, flume, aqueduct, reservoir, bridge, fence, street, sidewalk, fixtures or other structure or superstructure;
> 2. A mine or a shaft, tunnel, adit or other excavation, designed or used to prospect, drain or work a mine;
> 3. A system for irrigation, plants, sod or other landscaping;
> 4. The demolition or removal of existing improvements, trees or other vegetation;
> 5. The drilling of test holes;
> 6. Grading, grubbing, filling or excavating;
> 7. Constructing or installing sewers or other public utilities; and
> 8. Constructing a vault, cellar or room under sidewalks or making improvements to the sidewalks in front of or adjoining the property.

N.R.S. 108.22128.  Thus, an agreement for the improvement of property is an agreement for the development, enhancement, or addition to property by the provision of work, materials, or equipment.

Here, Tanamera agreed to purchase framing materials per superintendent's orders from Bridgewell for use in the Carson Hills project.  Bridgewell merely provided materials to Tanamera under the agreement.  Although Tanamera eventually used the materials to develop, enhance, and add to the Carson Hills property, the contract between Bridgewell and Tanamera

did not concern "the development, enhancement or addition" to the property.[14]  The contract only

concerned the provision of materials.  Put another way, neither Tanamera nor Bridgewell was

obligated to do any developing, enhancing, or adding to property.  The non-exhaustive list of

improvements confirms this interpretation.  Those improvements are developments,

enhancements, or additions to property—not merely the supplies needed to make such an

improvement.  *See* N.R.S. 108.22128(1)-(8).

<b>b.      Work of Improvement</b>

"Work of improvement" means "the entire structure or scheme of improvement as a

whole, including, without limitation, all work, materials and equipment to be used in or for the

construction, alteration or repair of the property or any improvement thereon, whether under

multiple prime contracts or a single prime contract except as follows. . . ."  N.R.S. 108.22188.

Thus, an agreement for the construction, alteration, or repair of a work of improvement is a

agreement for the construction, alteration, or repair of an entire structure or scheme of

improvement as a whole.

Here, the contract does not concern the construction, alteration, or repair of an entire

structure or scheme of improvement as a whole.  The contract only concerns the provision of

framing materials.  These are not "all the materials" to be used in the prime contract.  *See* N.R.S.

108.2216 (defining prime contract as "a contract between a prime contractor and the owner or

lessee of property about which the contract relates").  And, like how the contract does not require

---

[14] Although not at issue here, Tanamera's contract with Voltaire, the owner of the Carson Hills project, would likely meet this definition because Tanamera would be obligated to do the developing, enhancing, and adding to the property.  Tanamera's contracts with its subcontractors, who would develop, enhance, and add to the property with their work and materials, would also likely meet this definition.

any party to make any improvement to property, the contract does not require that any

"construction, alteration, or repair" occur.

Tanamera emphasizes that the Nevada legislature expressly recognizes that suppliers can

be lien claimants. Indeed, a lien claimant is "any person who provides . . . material . . . with a

value of $500 or more to be used in or for the construction . . . of . . . property." N.R.S.

108.2214. "The term includes, without limitation, every . . . person who provides . . . material

. . . in relation to the improvement, property or work of improvement." *Id.* "Material" is defined

as "appliances, equipment, machinery and substances affixed, used or to be used, consumed or

incorporated in the improvement of property or the construction, alteration or repair of any

improvement, property or work of improvement." N.R.S. 108.22144. But that Bridgewell might

have qualified as a lien claimant under different circumstances does not expand the scope of

N.R.S. 108.2453. Subsection 2214 is more expansive than subsection 2453 in that subsection

2214 only requires that the material provided be used in a construction project, whereas

subsection 2453 requires that there be an agreement for the improvement of property or for the

construction, alteration, or repair of a work of improvement.

As applied here, N.R.S. 108.2453 is not ambiguous. Under Nevada's rules of statutory

interpretation, that ends the inquiry. *See Lucero*, 127 Nev. at 95-96. Under Oregon's rules, the

court could consider legislative history if it appeared to be useful to the court's analysis. *Gaines*,

346 Or. at 172. Neither party has proffered any legislative history. Nonetheless, it is worth

mentioning that the purpose of statutes like N.R.S. 108.2543 is "to protect local subcontractors

from forum selection clauses" in construction contracts with large, national general contractors.

*Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC*, 333 F. Supp. 3d 1179, 1231 (D.N.M.

2018). Analyzing a handful of state laws similar to N.R.S. 108.2453, the court in *Presidential*

*Hospitality* found New Mexico's analogous statute voided forum selection clauses in contracts that could be "characterized as a contractor-subcontractor contract."  333 F. Supp. 3d at 1230-31. Here, Bridgewell is neither a contractor nor a subcontractor.

It is for this reason Tanamera's reliance on *Dancor Const., Inc. v. FXR Const., Inc.*, 2016 IL App (2d) 150839 (Sept. 29, 2016), is misplaced.  Tanamera is correct that comity requires courts in one state to honor other states' laws voiding forum selection clauses in construction contracts.  *See id.* ¶ 48.  But here, the parties' contract is not a construction contract.  As Bridgewell put it during oral argument, in as many words: "nobody who built anything in Nevada is being stiffed."  As such, N.R.S.108.2453(2)(d) does not invalidate the forum selection clause.

### v.    Forum Selection Clause Enforceability

Tanamera appears to concede that if the forum selection clause is part of the operative contract and it is not void under Nevada law, it is enforceable.  To avoid any confusion, it is worth stating why that is the case.

In a diversity action, when the defendant seeks dismissal for lack of personal jurisdiction and a forum selection clause places the litigation in the forum where suit is brought, the question of enforceability is answered by reference to state law by operation of Federal Rule of Civil Procedure 4(k).  *See generally* John Coyle & Katherine C. Richardson, *Enforcing Inbound Forum Selection Clauses in State Court*, 53 ARIZ. ST. L.J. 65, 72, 133-35 (2021).  However, federal law, by way of the test employed in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), and its progeny, determines enforceability because Oregon's long-arm statute is coextensive with the limits of federal due process and Oregon has placed no limits on the

enforcement forum selection clauses.  *See id.*  Under *M/S Bremen*, a forum selection clause

controls unless

> (1) the clause is invalid due to 'fraud or overreaching,' (2) 'enforcement would
> contravene a strong public policy of the forum in which suit is brought, whether
> declared by statute or by judicial decision,' or (3) 'trial in the contractual forum
> will be so gravely difficult and inconvenient that [the litigant] will for all practical
> purposes be deprived of his day in court.'

*Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 (9th Cir. 2018) (quoting

*M/S Bremen*, 407 U.S. at 15, 18).  These factors are not present here.

Thus, Tanamera has consented to personal jurisdiction in Oregon for the purpose of this

lawsuit.

## RECOMMENDATIONS

Tanamera's motion to dismiss (ECF 6) should be DENIED.  Bridgewell's motion to

strike (ECF 14) should be SUSTAINED.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if

any, are due Tuesday, June 15, 2021.  If no objections are filed, then the Findings and

Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendations will go under advisement.

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  June 1, 2021.


_____
   /s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge